Thank you. Good afternoon, and may it please the Court. My name is Sally Pei. I'm appearing on behalf of the appellant, Yasmin Juarez Coyoy. I'll watch the clock and try to reserve three minutes for rebuttal. The City of Eloy signed an agreement with ICE, under which it was the prime contractor for the establishment and operation of a massive immigration detention facility in Dilley, Texas. But the District Court held that Eloy's position is that even though Eloy collected $438,000 a year for being the prime contractor for Dilley, it owed no duties of care, no legal obligation whatsoever to ensure the well-being of the families and children detained there. Now, under that theory, Eloy had no greater duty than you or I to ensure that children detained at Dilley were being treated appropriately. Eloy could know for certain that its subcontractor was beating and abusing children at Dilley, and yet would have no legal obligation to do anything. Now, Arizona law does not... I think there's a difference here between the duty properly to choose a subcontractor and the duty to supervise. Now, if Eloy knew that the subcontractor was beating children on other occasions, is it your position that which of those two duties do you think he could be breached? So, Eloy had obligations under the contract that it signed with ICE. Those obligations are set forth in the performance work statement. As the signatory to this agreement, Eloy had the obligation to make sure that adequate services were provided. Let me ask you this. The question is, from a documents interpretation point of view, is there a service provider identified as a defined term in the contract? So, the contract defines service provider as the entity which provides the services described in the statement of work. And that is unquestionably Eloy, and I have three explanations for why. Eloy signed the contract as contractor, not as service provider, true? I don't think that's correct, Your Honor. Eloy provides the services described through its subcontractor, CoreCivic. Take a look at the signature line, if you would. Yes. Does the signature line say that Eloy is a service provider, or does the signature line say it's a contract? So, on the first couple of pages of this document, there's the header that says that Eloy is the contractor offeror. But there are also multiple other provisions of the contract that make clear that the service provider is Eloy. And I'll point you to a couple of those, if I may. The first one, even on page 79 of the excerpt of record, which is one of the pages on which Eloy is identified as the contractor in the header. On that very same page, there are several other references to service provider slash contractor, or service provider or contractor, which suggests that the terms are interchangeable. Two other examples in the record that I think show that Eloy is a service provider. The first one is on page ER146, which is attachment 7 to the 2014 modification. There it states, in the first sentence, this agreement becomes effective upon the date of final signature by the ICE contracting officer and the authorized signatory of the service provider. And now, it's undisputed that Eloy was the only signatory to this contract, so that stands to reason that service provider is Eloy. Also in the contract are two references to the start date of services. And the start date of services require two, it seems to me, preconditions. One of them is that there be an award document between ICE and CCA, and the other is that there be appropriate permits. Those seem to mean that regardless of when the document is executed and becomes effective, the actual provision of the services cannot take place until there is an ICE-CCA agreement to provide those services. That seems to indicate to me that the provider of the services is CCA, not the contractor. So, Your Honor, I know that there's a page in the ER where CCA is mentioned. I think that all of this points to the fact that, at a minimum, there's enough ambiguity about the interpretation of the term service provider. Now, if it's an ambiguity issue, I take it we don't have to follow Chevron because here we're not granting any deference to an agency interpretation of the statute. So, what do we do if there's an ambiguity? What type of channels of instruction do you suggest we use in order to resolve the ambiguity as a matter of documentary interpretation? Well, in the first instance, I think that exercise should be done by the district court at the motion to dismiss stage. We have alleged in our complaint that Eloy was the service provider and that it took on obligations under this agreement. It was inappropriate for the district court to decide that issue in the first instance, contrary to our allegations at the motion to dismiss stage. Well, the interpretation of written contracts, at least in California, I'm not so familiar with Arizona law, but at least in California, interpretation of written contracts is a question of law to be done by the court, not by any fact finder. Respectfully, Your Honor, I disagree with that. I think the question whether there's an ambiguity in the contract is a question of law, but once there's an ambiguity, the intent of the parties is a question of fact, and that's for the district court to determine. No, the parties as expressed in the contract is what you're talking about, not just the intent they have. Correct, as expressed in the contract, and if it's appropriate to look at parole evidence, that's for the district court to do as well. But that, again, just points to the fact that this shouldn't have been decided on 12B6. More importantly, our argument about duty under Section 324A of the restatement doesn't rely on Eloy being the service provider under the contract. Our key point here is that Eloy agreed to be ICE's prime contractor, and it was getting paid an enormous amount of money to do that, and any reasonable person would believe that a party that assumes an undertaking of this nature owes at least some duty to the children who are being detained at this facility. I have a question about that money, the $400,000 a year. Did Eloy pocket that, or is that then being transferred to CCA? That is money that Eloy is getting for its participation in this contract. And solely as a middleman, they get $400,000 a year? Well, for its participation in this scheme, I think the idea was that they would collect $438,000, and now Eloy's position is that it didn't have to do anything in order to get that money other than be the prime contractor. So ICE paid CCA directly? I'm not sure of the mechanics. I think that there are some provisions of the documents that suggest that ICE was paying money to Eloy, and Eloy would then transfer the per diem amount to CCA, but Eloy itself was collecting some amount of money under this agreement. Do I understand correctly that the reason, or a fundamental reason, why ICE wanted to deal with Eloy is it allowed them to circumvent the competitive bidding process? That's correct, Judge Hawkins. That's set forth in the report that the DHS Inspector General issued in 2018 that was analyzing this particular arrangement. This was a workaround that ICE, under the Obama administration, devised in order to get around the procurement requirements to be able to rapidly establish and operate this dually facility for thousands of people who were coming across the border in 2013-2014. So by providing $400,000 plus to an entity that claims it had no responsibility for the operation of this facility, they deprived the taxpayers of competitive bidding for the construction and operation of the facility, correct? That's correct, and that's one of the main concerns that the DHS Inspector General had. The DHS Inspector General pointed out that Eloy was always legally responsible for this entire agreement. There was no contractual relationship between ICE and CoreCivic, and so there was no meaningful oversight over what CoreCivic was doing. And as you mentioned, Judge Hawkins, there was no competitive bidding process for this facility. Does that factor into our analysis at all? How does that affect whether or not Eloy assumes the duty over the detainees? So I think that the federal government's purposes for entering into this contract don't affect your analysis. I think what is important here is that Eloy itself agreed to participate in this arrangement. It agreed to lend its name and to be the prime contractor for this facility. And in doing that, it necessarily assumed at least some duty of care to the people who were detained there. Otherwise, the rule would be that Eloy had no legal obligation to do anything, even if it knew for sure that people were being mistreated, and that simply isn't the law. Arizona courts have long held that public entities cannot simply delegate away duties that they owe to people who are being involuntarily detained simply by hiring subcontractors. That's been the case since the Arizona Supreme Court's decision in 1985 in de Montenegro's Desert Manor Convalescent Center. So it's abundantly clear that Arizona courts would not countenance this kind of arrangement and would not countenance the idea that Eloy had no duty of care to the people detained at Dilley. Can I ask a question? There was that recent Arizona Supreme Court case that said that to have this duty of care, it must be assumed explicitly. So if you were to concede that the contract was ambiguous, the fact that Arizona courts required it to be explicit, doesn't that then mean that no duty of care was created? So I think that the court said that the duty can be assumed explicitly or by conduct. Right. There's definitely no conduct here that Eloy took to take care of the detainees. So it's just a question of whether or not it was explicit. Well, Eloy's conduct was entering into this agreement and agreeing to do these services. I mean, Eloy, you know, I think Eloy wasn't... Sorry. I mean, we would concede that Eloy never performed those services. That's correct. Eloy wasn't the one that was mopping the floors and feeding and clothing people. Right. So then how do you deal with the explicit argument? Then if it's not explicit in the contract, then under Arizona law, it seems like there can be no transfer of the duty or assumption of the duty. Well, whether the contract was ambiguous or not is a question of who should decide. For our purposes, it's a question of, you know, the district court can go back and look and see what the contract actually did. And, you know, if it turns out that Eloy, as we argue, is the one who that is legally responsible for this whole agreement. If we look at the agreement and the agreement only and don't consider any parole evidence, why aren't we in exactly the same position as the district court? And shouldn't we be looking no-go as a matter of documentary interpretation at what the contract said? Well, at the 12B6 stage, we're entitled to have our allegations construed in our favor. And it was inappropriate for the district court to construe our allegations about, you know, who the service provider is against us at this stage of the litigation. Well, the allegations that there's a service provider, that's a conclusory statement. Isn't that unwritten, vulnerable? I think it's an allegation of fact that the contract made Eloy the service provider. If I may, I'd like to reserve the remainder of my time. But, Judge May, I'm happy to answer more questions about this if I've satisfied you. Thank you. Okay. Thank you, counsel. Mr. Aceto? Sorry. Good afternoon. I'm Nicholas Aceto, counsel for the city of Eloy. A duty under the restatement, section 324A, exists only if a party undertakes to render services to another. An undertaking is a promise to do a particular thing. In signing the modified IGSA, the city of Eloy did not agree to perform any service at the South Texas Family Residential Center. The sole function of the IGSA was to allow ICE to delegate its duties regarding immigration detainees to CCA. Let me see if I understand, counsel, your position. Your position is that this contract is absolutely clear that your client, the city of Eloy, had no responsibility whatsoever about the construction of the facility, its operation, its maintenance, its dealings with the people, the inmates there. And that is absolutely clear from the face of the document. That's our position, your honor. That's your position? Yes. Will you tell me why, then, let me prevent me this follow-up. Will you tell me why, then, you demanded that the contractor give you a hold harmless? Well, I wasn't privy to the negotiations, but those hold harmless indemnification... We're responsible for the record in this case, and it seems to me to be a basic contradiction to say that the agreement is absolutely crystal clear that your client, Eloy, had no responsibility for the claims presented in this complaint. Yet, in the negotiating process, they demanded that the private contractor, CoreCivic, give them a hold harmless. Aren't those two positions inconsistent? I believe so, your honor. I mean, to look at whether or not... I need you to speak up a little more. I'm having a little trouble hearing you. Me, too. I apologize. The contract explicitly states that only the service provider is to perform detention services. As Paige outlined, the contract defines who that service provider should be, and it's made even more explicit in the agreement between Eloy and CoreCivic. Still louder. Please, still louder. I apologize. And in that contract, your honor, it has a standard indemnification provision, which is standard in every contract. And simply because the parties want to make clear to each other who is responsible for any claims, that doesn't take away or engraft or add responsibilities to either party. The services and who is supposed to provide them is laid out in the IGSA. The indemnification... Did your client move for summary judgment? No, your honor. We moved under Rule 12b-6. Wouldn't this be an entirely different appeal if they had, and the district court had found as a matter of fact, that your client had absolutely no responsibility for the operation of the Dilley facility? They would have had the summary judgment granted. Wouldn't it be a different appeal? I'm not sure what you mean, your honor, whether they would appeal... Irrespective of what the contract says or how it can be interpreted or whether it's ambiguous or not. If you had also filed a motion for summary judgment supported by declarations or affidavits that made absolutely clear that as a matter of fact, Eloy had nothing to do with the operation of the Dilley facility, wouldn't this be a different appeal? I don't think so, your honor. I think it would be the same appeal because we would be relying on contractual documents. And if you want to rely on the plaintiff's allegations, they're the ones that allege in their complaint that Eloy was merely a middleman. That comes from their complaint. They allege that Eloy had nothing to do with the negotiations. Don't you think it would have been relatively simple for your client to prove factually that the city of Eloy had nothing to do with the operation of the Dilley facility? It would have been more difficult to do than just relying on the contract. The contract is just as plain. And isn't that what you're trying to get to? You just want to do it without an examination of the facts, right? We want to hold the plaintiffs to the standards under Iqbal and Twombly, which is that they have to plausibly state a claim. And if they haven't done that— But you're telling this panel we don't have to look at the facts. Just look at the document. Well, the document are the facts. And the way that the case is before the court now is on a motion for— The interpretation of the document is a question of law, isn't it? That's correct, Your Honor. Okay. All right. Then why not examine the facts? You say the document provides—is not ambiguous at all. What's the standard on a motion of this type given the complaint? Well, it's a de novo review. And you must accept all allegations in the complaint as true unless they are contradictory to documents that are incorporated or referenced by the complaint. The plaintiff in this case says the contract's ambiguous. Sure. And let me quote— Isn't the standard at this level of appeal, whether they've made a plausible argument in that regard? No, it's not, Your Honor. I'll cite the case called Chandler Medical Building Partners v. Chandler Dental Group. This is the Arizona Court of Appeals case, 175 errors, 273. And this is a quote from that case. Whether a contract is ambiguous is a question of law. The mere fact that parties disagree as to its meaning does not establish an ambiguity. So the fact that claims counsel can just assert there's an ambiguity, that's not enough. What the court should do, like the district court, is look at the allegations in the complaint, look at the contractual documents. Where they conflict, you must defer to the contractual documents and decide whether or not there's ambiguity. Doesn't the contract in the provision, the signatory provision, that my colleague Judge Bea referred to describe Eloy as the contracting party? That's correct, Your Honor. And isn't it true that in other parts of the document Eloy is referred to as the service provider? No, I don't think that that's true at all. I think the service provider is referencing the party that is responsible for providing services. The fact that the contract refers to a contractor and a service provider shows that they have two distinct meanings. And as Judge Bea has pointed out, underneath the city of Eloy it says that they are the contractor. How much time elapsed between the time that Eloy signed the agreement with ICE and the signing of the agreement with CoreCivic? How much time elapsed? It appears that it was on the same day, Your Honor. But was there a period of time between the two? Were you there? I was not, but the IGSA actually... Do you know? I do not know. Well, let's assume for the purpose of my question that there was an hour's time difference between the time that Eloy signed and CoreCivic signed. In that one hour, in my hypothetical question, who was the service provider? CoreCivic was and always has been the service provider. Even between the two? That's right. The time period between the two. Suppose there was two days' time period between the two. There was a full day's period between the time that Eloy signed and CoreCivic signed. That's correct, Your Honor. The passage of time doesn't change who the service provider was. Does the contract between ICE and the city of Eloy say that CoreCivic is intended always to be the service provider? Does it say that? Not explicitly, but what it does say is that the detainees are to be held at the South Texas Family Residential Center, and that is a facility that's owned and operated by CoreCivic, by CCA. Okay. I've given you enough trouble. Go ahead with your argument. Thank you, Your Honor. As I was saying, I maintain that the contractual documents make clear that it has always been, and only can be, CCA was the service provider. Can I ask two questions, then? One, the $438,000 Eloy received a year, did they pocket that, or did that go to CCA? That goes to Eloy. That goes to the city of Eloy. Doesn't that undercut your argument, though, that usually if it's a finder's fee or middleman fee, you pay one fee, but here it seems like Eloy's paid every year, so that seems to undercut the argument that you had no responsibility of services, or Eloy had no responsibility for services. I don't think it's inconsistent, Your Honor, because whether that administrative fee, for example, is $2 million in one lump sum, or $438,000 over the course of two or three years, I don't think it's any different. Okay. And then my second question is, there is a CCA facility in Eloy. Does Eloy contend that they are not the service provider of that facility as well? Correct, correct. CCA is the service provider of that facility as well, and that IGSA agreement was in effect back in 2006, and so CCA has always been the service provider of that contract, and what this modified IGSA was just a piggyback off of that contract, so that's further evidence that no one intended anyone other than CCA to be the service provider at the Dilley facility. I'd like to briefly address the plaintiff's alternative argument that they try to make on appeal for the first time, and that's they've shifted from alleging that CCA or that Eloy had a duty to ensure that the detainees at the facility were safe and secure and received medical care, to Eloy had a duty to ensure that they adequately select the contractor. As we've argued in our brief, that claim was never raised before. The plaintiffs argue that the waiver principle only applies if they're trying to assert new claims, not new arguments. Well, that is a new claim. That is essentially a negligent selection claim, and if you look at the complaint, the complaint negligence claims only allege that Eloy was negligent in ensuring a safe operation of the facility. So this negligent selection claim that they're pursuing on appeal, it is a claim, it is a new theory of liability, and it is waived. On the merits of that claim, I'd also point out that as Judge Tucci ruled, that there is no merit to that duty argument either, and that's because Eloy never sought to, never searched for it or recommended for CCA. It was always a preordained, a predetermined arrangement between ICE and CCA. The only thing that Eloy did was sign the contract, and merely signing that contract isn't the undertaking of a service. It's signing a contract, and that's all that they had signed up to do. Unless there are any further questions, I have nothing further. Well, yeah, I just have one last question. Sure. What did Eloy do to earn $438,000 other than sign the agreement? That's what they did was they signed the agreement. Okay. Any other questions? Okay. Thank you, counsel. Ms. Pei. Thank you, Your Honor. I have just a couple points on appeal, on rebuttal. I'm going to first address counsel's statement that CoreCivic was and always was the service provider. So the way this whole arrangement worked was that Eloy assumed contractual obligations to ICE. Eloy was free to delegate those obligations to a subcontractor, which it did, but that doesn't mean that it was relieved of all legal responsibility for the agreement. ICE never had a direct contractual relationship with CoreCivic. And furthermore, what if CoreCivic decided to terminate the subcontract with Eloy for whatever reason? It's not clear who would be the service provider under Eloy's theory if for whatever reason CoreCivic decided that it no longer desired to perform or provide services. Ms. Pei, you said that ICE never had a direct contractual relationship with CCA. What was the award document? Wasn't that a direct relationship with CCA? So that award document, I have not seen it. It's not in the record. The DHS Inspector General in its 2018 report at page 52 of the record stated that there's no contractual relationship between ICE and CoreCivic. How does CoreCivic get paid? So I don't know that that is explicitly spelled out in the documents either. My understanding is that ICE is remitting, in addition to whatever amount that Eloy is getting, it's remitting a per diem fee to Eloy based on the number of detainees, I suppose. And then Eloy is passing that on to CoreCivic. But that's just based on my reading of the documents. I don't know what the actual underlying facts are, which just goes back to Judge Hawkins' point about the need for factual analysis on this and the fact that this really was not appropriately addressed at a motion to dismiss. I also wanted to briefly address the alternative argument that Mr. Acedo brought up, but I also see that I've exceeded my time, so I'm happy to stop. We'll give you a minute. Go ahead. Okay, thank you. So the argument was not raised for the first time on appeal, so I think it might help just to step back a little bit and describe how it was that we've litigated these claims. So from the beginning, our argument has been that Eloy assumed the duty of care by agreeing to serve as the prime contractor in this arrangement with ICE and CoreCivic. That duty included the responsibility to monitor its subcontractor's performance, which it failed to do. That's stated in the complaint at paragraphs 115 to 117, also 121 and 122. And the way that Arizona courts have generally analyzed this kind of situation, which really is just a normal general subcontractor arrangement, is by looking first at, well, what duties does the general contractor owe, and then what are those duties delegable to a subcontractor. So that's how we framed it. To the extent the district court instead decided to analyze this question by asking whether Eloy's mere act of signing the subcontract alone gave rise to an independent duty of care. Now, that may be a slightly different argument, but we think it's fairly encompassed in the claims that we brought, and it's properly before this court. The district court addressed it at length in its opinion below. Both parties had ample opportunity to address it, so this court should be free to do so as well if it wishes. I have nothing further unless there are other questions from the panel. Thank you, counsel. I appreciate it. So that is our last case on the calendar, and so this court will stand in recess until 2 p.m. tomorrow.
judges: Hawkins, Bea, Bumatay